PHILIP CASWELL, Jr., et al., Appellants, *v.* THOMAS DAVIS, Respondent.

An exception to a referee's finding of fact will not authorize a reversal of the judgment entered upon his report, unless it is made to appear that there is no competent testimony to sustain the finding; that his conclusion of law necessarily depends upon such finding; and, further, that there is no other fact presented by the evidence, and which the referee might have found, which will justify his conclusion of law and the judgment based thereon.

Though one discover or invent an article and give it a peculiar and distinctive name, if he permit another with his acquiescence to appropriate it with that name and to put it forth to the public as his own, that other will become the proprietor of the name if he meets the other conditions prescribed by the law in such cases.

Words or phrases in common use and which indicate the character, kind, quality and composition of an article of manufacture, cannot be appropriated by the manufacturer, exclusively to his own use, as a trade mark; and this is so, although the form of the words or phrases adopted also indicate the origin and maker of the article, and were adopted by the manufacturer simply for that purpose. The combination of words must express only the latter to authorize its protection as a trade mark.

Plaintiffs prepared a medicine, the principal ingredients of which were iron, phosphorus and elixir of calisaya bark, to which they gave the name of " Ferro-Phosphorated Elixir of Calisaya Bark," and so labeled the bottles containing it. *Held*, that this phrase could not be protected as a trade mark.

(Argued June 5, 1874; decided September 22, 1874.)

APPEAL from judgment of the Court of Common Pleas for the city and county of New York, affirming a judgment in favor of defendant entered upon the report of a referee.

This was an action to restrain defendant from the use of words claimed by plaintiffs as a trade mark.

The referee found the following facts: That plaintiffs were carrying on the drug business, in the city of New York, under the firm name of Caswell, Mack & Co., they being successors and assignees of the firm of Caswell, Mack & Co. That during the year 1860, and for some time thereafter, the defendant was in the employ of said Caswell, Mack & Co.,

as porter; and, also, during said time one Henry M. Coffin was in the employ of said firm as pharmaceutical chemist. That some time in the month of December, 1860, and the latter part of the year 1860 the said Coffin, while in the employ of said firm of Caswell, Mack & Co., as their said chemist, scientifically prepared a medicine, the principal ingredients of which were iron, phosphorus and elixir of calisaya bark, to which he, the said Coffin, gave the name "Ferro-Phosphorated Elixir of Calisaya Bark." That the said firm of Caswell, Mack & Co., in the spring of the year 1861, introduced the said preparation, by that name, to several of the leading physicians of this city, and as a result of said introduction many physicians of this city prescribed the preparation to their patients, and it was adopted and became generally a regular scientific preparation by physicians prescribed in cases where iron, phosphorus and calisaya bark were necessary to be taken. That in the year 1864 the defendant left the employ of said Caswell, Mack & Co. and commenced to manufacture this preparation, under this particular name, under a firm name of Munroe & Davis, and continued to manufacture and sell the same for about nine months when the said firm of Caswell, Mack & Co. purchased from the said Munroe & Davis all of their stock and fixtures and all of the preparation they then had on hand (some fifty gallons), in consideration of $400, which was paid. That shortly after this sale and purchase the defendant Davis commenced to manufacture and sell this preparation under this particular name, but as the manufacture of T. Davis & Son, and continued to do so for nearly two years and until October, 1867, when the injunction in this action was served upon him. That the combined words, "Ferro-Phosphorated Elixir of Calisaya Bark," were not applied to the medicine by the said Coffin, nor used by the firm of Caswell, Mack & Co. as a name to designate the ownership, origin or particular manufacture of this preparation, but solely to indicate to physicians and the community of druggists the name of the three principal medical ingredients of which it was com-

posed, to wit, iron mixed or combined with phosphorus, with elixir of calisaya bark. That the three principal ingredients indicated and put into this preparation, iron, phosphorus and calisaya bark, were known in *materia medica* and prescribed by physicians many years previous to the year 1860 in some form, and well known by pharmaceutical chemists. And, as matter of law, he found that neither Caswell, Mack & Co., nor the plaintiffs, had the exclusive right to the use of the said name as applied to this preparation and directed judgment against the plaintiffs, which was entered accordingly.

Further facts appear in the opinion.

*Thomas A. Jenkins* and *John S. Woodward* for the appellants. The name as used is one entitled to legal protection, as a trade mark. (*Burnett* v. *Phalon*, Am. Tr. M. C., 376–400; *C. and E. Spg. Co.* v. *H. R. C. Spg. Co.*, id., 599, 631; *D. and H. Canal Co.* v. *Clark*, 13 Wall., 311.) The name became the rightful trade mark of Caswell, Mack & Co., and of the plaintiffs, when used in connection with the article made and sold by them, and affixed in a stamp or label first used by them to bottles or other vessels containing the article, for the purpose of designating the same. (*Thomson* v. *Winchester*, 19 Pick., 214 [Am. Tr. M. C., 7]; *Taylor* v. *Carpenter*, 3 Story, 458 [Am. Tr. M. C., 14]; *Coates* v. *Holbrook*, 2 Sandf. Ch., 586 [Am. Tr. M. C., 20]; *Taylor* v. *Carpenter*, 2 Wood. & M., 1 [Am. Tr. M. C., 32]; *Taylor* v. *Carpenter*, 11 Paige, 292 [Am. Tr. M. C., 45]; *Taylor* v. *Carpenter* [the "Persian Thread" case], 2 Sandf. Ch., 603 [Am. Tr. M. C., 45]; *Partridge* v. *Menck* [the "Friction Match" case] 2 Sandf. Ch., 622; 2 Barb. Ch., 101; 1 How. App. Cases, 558 [Am. Tr. M. C., 72]; *Coffeen* v. *Brunton* [the "Chinese Liniment" case], 4 McLean, 516 [Am. Tr. M. C., 82]; *The Amoskeag Manufacturing Co.* v. *Spear*, 2 Sandf. Ch., 599 [Am. Tr. M. C., 87]; *Davis* v. *Kendall* [the "Pain-killer" case], 2 R. I., 566 [Am. Tr. M. C., 112]; *Stone* v. *Carlon* [the "Irving House" case], 3 Code R., 67 [Am. Tr. M. C., 115]; *Marsh* v. *Billings* [the "Revere

House" case], 7 Cush., 322 [Am. Tr. M. C., 118]; *Gillott* v. *Kettle,* 3 Duer, 624 [Am. Tr. M. C., 148]; *Christy* v. *Murphy* [the "Christy Minstrels" case], 12 How. Pr., 77 [Am. Tr. M. C., 165]; *Walton* v. *Crowley,* 3 Blatch., 440 [Am. Tr. M. C., 166]; *Stewart* v. *Smithson,* 1 Hilt., 119 [Am. Tr. M. C., 175]; *Clark* v. *Clark* [the "Clark's Thread" case], 25 Barb., 76 [Am. Tr. M. C., 206]; *Brooklyn White Lead Co.* v. *Masury,* 25 Barb., 416 [Am. Tr. M. C., 210]; *Williams* v. *Johnson* [the "Genuine Yankee Soap" case], 2 Bosw., 1 [Am. Tr. M. C., 214]; *Comstock* v. *White* [the "Dr. Morse's Indian Root Pills" case], 18 How. Pr., 421 [Am. Tr. M. C., 232]; *Burrows* v. *Knight* [the "Roger Williams Long Cloth" case], 6 R. I., 434 [Am. Tr. M. C., 238]; *Howe* v. *Searing* [the "Howe's Bakery" case], 19 Abb. Pr., 261; 6 Bosw., 354; 19 How. Pr., 14 [Am. Tr. M. C., 244]; *Dale* v. *Smithson* [the "Courtria Flax" case], 12 Abb. Pr., 237 [Am. Tr. M. C., 282]; *Burnett* v. *Phalon* [the "Cocoaine" case], 21 How. Pr., 100 [Am. Tr. M. C., 292]; 9 Bosw., 192; 5 Abb. Pr. [N. S.], 212; 3 Keyes, 594 [Am. Tr. M. C., 376]; S. C. in Court of Appeals [Am. Tr. M. C., 397]; *Woodward* v. *Lazar* [the "Whatcheer House" case], 21 Cal., 448 [Am. Tr. M. C., 300]; *McCardle* v. *Peck* [the "McCardel House" case], 28 How. Pr., 120 [Am. Tr. M. C., 312]; *Bininger* v. *Wattles,* 28 How. Pr., 206 [Am. Tr. M. C., 318]; *Derringer* v. *Plate,* 29 Cal., 292 [Am. Tr. M. C., 324]; *Bradley* v. *Norton* [the "Superphosphate of Lime" case], 33 Conn., 157 [Am. Tr. M. C., 331]; *Gillott* v. *Esterbrook,* 47 Barb., 455 [Am. Tr. M. C., 340]; *Matsell* v. *Flanagan* [the "Police Gazette" case], 2 Abb. Pr. [N. S.], 459 [Am. Tr. M. C., 367]; *Smith* v. *Woodruff* [the "Opoponax" case], 48 Barb., 438 [Am. Tr. M. C., 373]; *Newman* v. *Alvord* [the "Akron Cement Co." case], 49 Barb., 588 [Am. Tr. M. C., 404]; *Howe* v. *The Howe Machine Co.* [the name "Howe" on sewing machines; license against inventor], 50 Barb., 236 [Am Tr. M. C., 421]; *Curton* v. *Bryan* ["Mrs. Winslow's Soothing Syrup" case], 2 Daly, 212; 36 How. Pr., 33 [Am. Tr. M. C., 434]; *Messerole* v. *Tynbery* [the "Bismarck Collar" case],

4 Abb. Pr. [N. S.], 410; 36 How. Pr., 14 [Am. Tr. M. C.,
479]; *Rowley* v. *Houghton* [the "Hero" or "Heroine" Jar
case], 2 Brewster, 303 [Am. Tr. M. C., 486]; *Boardman* v.
*The Meriden Brittania Co.* [the "Teaspoon" case], 35 Conn.,
402 [Am. Tr. M. C., 490]; *Colton* v. *Thomas* [the "Colton
Dental" case], 2 Brewster, 308 [Am. Tr. M. C., 507]; *Filley*
v. *Fassett* [the "Charter Oak" stove case], 44 Mo., 173
[Am. Tr. M. C., 530]; *Lockwood* v. *Bostwick* [the "Boviline"
case], 2 Daly, 521 [Am. Tr. M. C., 555]; *The Dixon Crucible
Co.* v. *Guggenheim* [the "Stove Polish" case], 2 Brewster,
321 [Am. Tr. M. C., 559]; *Gillis* v. *Hall* [the "Hair
Renewer" case], 2 Brewster, 342 [Am. Tr. M. C., 580, 596];
*The Congress and Empire Spring Co.* v. *The High Rock
Congress Spring Co.,* 57 Barb., 526; S. C., 45 N. Y., 291
[Am. Tr. M. C., 599]; *The Delaware and Hudson Canal
Co.* v. *Henry C. Clark,* 13 Wall., 311; Pat. Office Gazette,
vol. 1, p. 279; VAN VORST, J., in *Caswell* v. *Davis,* 4 Abb.
Pr. [N. S.], 6; 35 How. Pr., 75 [Am. Tr. M. C., 429]; *Gout*
v. *Alepologu* [the "Pesendede" case], 6 Beav., 69, Appendix
[Am. Tr. M. C., 636]; *Knott* v. *Morgan* [the "London Con-
veyance Co." case], 2 Keen, 213 [Am. Tr. M. C., 637];
*Pidding* v. *Howe* [the "Howqua's Mixture" tea case], 8
Sim., 477 [Am. Tr. M. C., 640]; *Millington* v. *Fox* [the
"Crowley Millington" case], 3 Mylne & Cr., 388 [Am. Tr.
M. C., 642]; *Morison* v. *Salmon* (the "Morison Universal
Medicine" case], 2 Man. & G., 385 [Am. Tr. M. C., 643];
*Perry* v. *Truefitt* [the "Medicated Mexican Balm" case], 6
Beav., 66 [Am. Tr. M. C., 644]; *Croft* v. *Day* [the "Day
& Martin Blacking" case], 7 Beav., 84 [Am. Tr. M. C., 649];
*Hine* v. *Lart* [the "Ethiopian Stocking" case], 10 Jur., 106
[Am. Tr. M. C., 657]; *Rodgers* v. *Nowill* [the "Rodgers
& Son's" cutlery case], 5 Man. & Gr. [Am. Tr. M. C.,
660]; *Holloway* v. *Holloway* [the "Holloway Pills" case],
13 Beav., 209 [Am. Tr. M. C., 662, 669]; *Eddleston* v. *Vick*
[the "Patent Pins" case], 18 Jur., 7 [Am. Tr. M. C., 666];
*Edelsten* v. *Edelsten,* 1 De G., J. & S., 185 [Am. Tr. M. C.,
667]; *Hall* v. *Barrows,* 10 Jur. [N. S.], 55 [Am. Tr. M. C.,

668]; *McAndrews* v. *Bassett* [the "Anatolia" case], 10 Jur. [N. S.], 550 [Am. Tr. M. C., 669]; *Braham* v. *Bustard* [the "Excelsior White Soft Soap" case], 9 L. T. [N. S.], 199 [Am. Tr. M. C., 674]; *Harrison* v. *Taylor* [the "Durham Mustard" case], 11 Jur. [N. S.], 408 [Am. Tr. M. C., 675]; *Ainsworth* v. *Walmesley* [the "Ainsworth Thread" case], 44 L. J., 252 [Am. Tr. M. C., 678]; *Southorn* v. *Reynolds* [the "Southorn's Broseley Pipes" case], 12 L. T. P. [N. S.], 77 [Am. Tr. M. C., 688]; *Seixo* v. *Provezende*, L. R. [1 Ch. App.], 192.)

*J. D. Billings* for the respondent. The words or name used did not designate the origin or ownership of the article and have become by adoption and use its proper scientific appellation and are not therefore a trade mark. (*Amos. Manfg. Co.* v. *Spear*, 2 Sandf., 599; *Feteridge* v. *Wells*, 4 Abb., 385; *Williams* v. *Johnson*, 2 Bosw.; Upton T. M., 1860, 123–178.) Defendant did not use plaintiffs' firm name, or their labels or devices, but simply the name of the preparation, and he did not therefore deceptively use the same name or mislead ordinary attention. (*Patridge* v. *Menck*, 2 Sandf. Ch., 622; S. C., 2 Barb. Ch., 101; 1 How. App. Cas., 547; *Merri. Manf. Co.* v. *Garner*, 2 Abb. Pr., 318; *Newman* v. *Alvord*, 49 Barb., 596, 597; *Clark* v. *Clark*, 25 Barb., 76; *Meri. Co.* v. *Gunn*, 4 E. D. S., 387.)

FOLGER, J. It is important first to determine just what is before us for adjudication on this appeal.

It is an appeal upon the law alone, from a judgment of the General Term, affirming a judgment entered upon the report of a referee. It of course brings up only questions of law; and we cannot, in our examination thereof, go outside of the exceptions taken; nor can we in this case consider all of the exceptions taken therein. Some of them are to the refusals of the learned referee to make certain findings of fact at the request of the plaintiffs. These exceptions present no question for review in this court (*Rogers* v. *Wheeler*,

52 N. Y., 262, citing *Van Slyck* v. *Hyatt*, 46 id., 259); in which last case is pointed out the proper practice, by which a party may avail himself, on appeal, of the refusals of a trial court to make findings of fact as requested.

All of the conclusions of law of the learned referee are excepted to. But these conclusions of law are correct if his findings of fact are sustained.

There are material exceptions to but two of the findings of fact. To make these exceptions potent for a reversal of the judgment, it must appear from an examination of the case, that there is no competent testimony to sustain the findings excepted to. Even then, it must appear further, that the conclusions of law necessarily depend upon these findings of fact, or upon one of them. And it must further appear, that with those or that finding unsustained by any competent testimony, there is no other fact presented thereby which will justify the conclusion of law arrived at, and the judgment based thereon. These are the limits within which our consideration of the case is confined.

The first finding of fact excepted to is this: That some time in the month of December, 1860, and the latter part of the year 1860, one Henry M. Coffin, while in the employ of the business house to whose business interests the plaintiffs succeeded, as its chemist, scientifically prepared a medicine, the principal ingredients of which were iron, phosphorus and elixir of calisaya bark, to which he gave the name " Ferro-phosphorated Elixir of Calisaya Bark." If by the phrase "scientifically prepared a medicine," is meant that he in fact put together the ingredients and manufactured it, the finding is sustained by the testimony. If by it is meant that he discovered, or invented it, it is not sustained by any competent testimony. The witnesses Caswell and Mack, both claim in their testimony that they, working and planning in concert with Coffin, finally devised the combination of ingredients which formed the perfected article; and Coffin, in answer to the question, " who suggested the phosphorus?" testified, that before it was finally perfected, Mack suggested to him to put into the

preparation the pyro-phosphate of iron. As these three persons, by the united force of the testimony, are all who had anything to do with the originating of the article; as it is not claimed that any one besides Caswell and Mack, other than Coffin, is the inventor; as Coffin admits that Mack suggested one of the chief and distinguishing ingredients, there can be no correct conclusion that Coffin, alone, was the originator of the article, though having very much to do with the devising the combination, and being exclusively, or almost so, the manipulator in its first concoction. As to who devised the name and first applied it to the article, there is conflict in the testimony. Mack and Caswell claim that it was first mentioned by Mack; Coffin is equally positive that he it was who first conceived and uttered it. The referee has believed the latter, and his finding thereupon is conclusive upon this court. This finding is not however so vital in the case, for, though Coffin was participant in the first compounding of the ingredients and in the completion of the article, and did first give it this name, yet he was in the employ of the predecessors of the plaintiffs, using their materials, upon their premises, with their apparatus. After the desired result was reached, it was, with its name, appropriated by them, and put forth to the medical profession and to the public, under that name, as theirs, with Coffin's knowledge and acquiescence, continued for some years. (*Flavel* v. *Harrison*, 19 Eng. Law and Eq., 15.) Had the composition of the article been well known to many, as well as to themselves and Coffin, and the ingredients in general use for the purpose, and though any person might combine them and sell the result at his pleasure, yet they had the right of property in that which they made, and the right to designate it as of their manufacture and sale, by some proper device upon it. (*Williams* v. *Johnson*, 2 Bosw., 1.) Coffin had not, nor had any one before them, used this name of " Ferro-phosphorated Elixir of Calisaya Bark," to designate to the public an article composed in whole or in part of these three chief ingredients. And the predecessors of the plaintiffs, adopting this name

with his acquiescence, became the proprietors of it, if with it they met the other conditions prescribed by the law in such cases.  They might affix any proper device or name to the article made by them, to distinguish it as of their manufacture, as having its origin with them, and as deriving its peculiar merit from their knowledge and skill in preparation.  So that the judgment of the learned referee is not sustained by this finding of fact made by him.  If it depended solely upon it, it could not be affirmed.

The other finding of fact excepted to is as follows : That the combined words, "Ferro-phosphorated Elixir of Calisaya Bark," were not applied to the medicine by Coffin, nor used by Caswell, Mack & Co., as a name to designate the owner-ship, origin or particular manufacture, of this preparation, but solely to indicate to physicians and the community of drug-gists, the name of the three principal medical ingredients of which it was composed, to wit, iron combined with phos-phorus and with elixir of calisaya bark.  This is an important finding.  If sustained by any competent testimony it is suffi-cient to uphold the conclusion of law and the judgment.  The learned judge who delivered the prevailing opinion at General Term looked upon it as fully warranting the judgment, and did not perceive anything in the evidence that would author-ize a contrary result.  He also stated that it was made by the referee upon conflicting proof.  We have, therefore, closely scanned the testimony, not only as indicated by the copious reference to it upon the points of the respondent, but as it appears everywhere in the case, to discover if this finding is sustained by the evidence.  The testimony on which it must rest, if at all, is as follows : The plaintiff Caswell testifies that they applied to the medicine made by them this name to designate it as their manufacture, to distinguish it from other preparations as manufactured by them ; that it was not their object in calling it *ferro* and *phosphorated* to announce to the *public* that there was iron and phosphorous in that medicine.  The witness Mack testifies that they· had two objects in view in getting a name for it : The first, to make

it specifically their preparation, made only by them, and to get a name that had not been previously used at all; the second, to indicate to the medical profession what were the general ingredients of the medicine. Caswell also says that the last was an object with them. It seems, then, that one of the objects, in the contemplation of the plaintiffs and their predecessors, was the very thing for which a trade mark is designed and is appropriate, and for which its exclusive use is permitted and protected. We are aware that Coffin says, that when he gave that name to the article and when he used the words, he did so as a true representation of the name of the ingredients of which the medicine was composed, and that that was what he intended by the use of it. It may be so. As the inventor of the word that may have been his object in bringing it into existence. There is no doubt that it effected that object. The testimony is full enough that this name did indicate that these three ingredients in some form, in some relation, strength and quantity, and with or without other ingredients, were in the mixture. But Coffin does not speak for the plaintiffs and their predecessors. He does not say what was their object in putting this name upon this article. Their testimony is not conflicted with by his upon this question. He speaks only of his purpose; they speak of theirs. But, as before said, there is ample testimony that the name used did indicate, in a general way, that there were in the mixture these three ingredients of iron, phosphorus and that elixir. It is also in proof that the plaintiffs made no secret of the formula for the composition of it, but made public all the constituents and the proportions in which they were to be put together. We do not think, however, that this is proof that the sole purpose of the plaintiffs in the use of this name was to make known to the medical profession and to the community of druggists what were the ingredients of this medicine. Hence, we are forced to the end that there is no competent testimony to sustain this finding of fact of the learned referee in its literal expression. It was a purpose of the plaintiffs, but it was not the sole purpose of them and

of their predecessors; and if the judgment depended upon
this finding, as literally stated, it could not be affirmed.

It is still left to inquire whether the testimony discloses
any fact which, though not formally expressed in a finding,
will sustain the conclusion of law and the judgment of the
learned referee.

On the motion for a dismissal of the complaint the learned
referee expressed himself satisfied that the plaintiffs had made
a *prima facie* case, that the defendant had used labels,
devices, etc., calculated to deceive the public, and to induce
a belief that the elixir which he sold was the same as·that
made and sold by the plaintiffs. We think that this position
is sustained by the proofs, for though there is a difference in
the phraseology of his circulars and a difference in the bottles
used by him, and though he has put his own business name
upon his labels, yet there is such degree of imitation of the
labels, circulars and bottles of the plaintiffs as would be
likely to deceive the public. ( *Williams* v. *Johnson, supra ;
Amoskeag Mfg. Co.* v. *Spear*, 2 Sandf., 599.) The courts
would, therefore, be desirous of restraining and .punishing
this designed interference with the business of the plaintiffs
if they have established their right to use as a trade mark the
controverted words and phrases. But there is testimony in
the case which stands in their way, testimony which would
well sustain a fact which, though not explicitly found by the
referee, may have formed, to a great extent, the basis of his
judgment. (See *Newman* v. *Frost*, 52 N. Y., 422.) It is,
that this name of this medicine, this alleged trade mark,
indicates to the medical profession, to the community of
druggists and to the public, the principal ingredients of which
the article is composed; and it is urged that, though it may
also indicate the origin and ownership of the article, still the
plaintiffs are precluded from the exclusive use of it for that
purpose. Upon this view of the case the judgment of the
General Term was, to some extent, based.

There is no principle more firmly settled in the law of
trade marks, than that words or phrases which have been in

common use and which indicate the character, kind, quality and composition of the thing, may not be appropriated by any one to his exclusive use. In the exclusive use of them the law will not protect. (*The Amoskeag Manufacturing Co.* v. *Speer, supra; Fettridge* v. *Wells,* 4 Abb., 144; S. C., 13 How. Pr., 385.) Nor does it matter that the form of words or phrases adopted also indicate the origin and maker of the article. The combination of words must express only the latter. It is the result of all the decisions, that known words and phrases indicative of quality and composition are the common property of all mankind. They may not be appropriated by one to mark an article of his manufacture, when they may be used truthfully by another to inform the public of the ingredients which make up an article made by him. Even when the sole purpose of the one who first uses them is to form of them a trade mark for himself, expressive only of origin with himself, if they do in fact show forth the quality and composition of the article sold by him, he may not be protected in the exclusive use of them. Still less, then, when joined to the fact that they do thus show forth the quality and composition, there is a purpose that they should do so. It is a right which every one has, and from the exercise of which he may not be debarred, to make an article of the same ingredients, of the same composition and of as good quality as that made by another, when that other has no exclusive privilege of manufacture conferred by law. Having this right to make, he has also the right to indicate the ingredients, the composition and quality of that which he has made, by any usual words or phrases apt therefor. Hence, when he adopts usual phrases which do no more than this, he but takes from a stock common to all mankind, and does not infringe upon any exclusive right of another, who has, before that, used the same or like words or phrases. Nor can the first user avoid this result, by coupling with his purpose to indicate quality and characteristics, a purpose also to indicate origin. Though he have that purpose also, and the form of words used by him have also that effect, inasmuch

as he cannot be given the exclusive use, without impairing the right of another, the exclusive use will be denied. The general rule is against appropriating mere words as a trade mark. An exception is, of those indicating origin or ownership, having no reference to quality or use. Words are but symbols. When they are used to signify a fact, or when, with what purpose soever used, they do signify a fact which others may by the use of them express with equal truth, others have an equal right to them for that purpose. (*The Collins Co.* v. *Cowen*, 3 Kay & J., 428.)

There are cases wherein some of the language of the opinions, if read without a consideration of the facts upon which the judgment is based, do not seem to accord with these views. The appellants have cited some of them. It will be found that in those cases there was no question presented like that now before us. It was not necessary in them to notice it, nor to limit the general propositions expressed. Or it will be found that there is other language used, which does state other principles also to be considered, and which set forth a limit. Thus, in *Delaware and Hudson Canal Co.* v. *Clark* (13 Wall., 311), much relied upon by the appellants, and from which they quote language quite apposite to the views urged by them, it is also said, " nor can a generic name or a name merely descriptive of an article of trade, of its qualities, ingredients and characteristics, be employed as a trade mark, and the exclusive use of it be entitled to legal protection." " True, it may be that the use by a second producer, in describing truthfully his product, of a name or of a combination of words already in use by another, may have the effect of causing the public to mistake as to the origin or ownership of the product; but if it is just as true in its application to his goods as it is to those of another who first applied it, and who therefore claims an exclusive right to use it, there is no legal or moral wrong done."

It is claimed by the appellants that though the words " ferro" and " elixir of Calisaya Bark " have long been commonly known and used, and the word " phosphorated " has

been applied to substances treated with phosphorus, yet that the combination in one phrase, " ferro-phosphorated," was new with the plaintiffs, or their predecessors in right; and had never before been used for any purpose whatever. It is also claimed that the word "phosphorated" is not a scientific term and does not technically express any meaning, nor convey to a technical manipulator an exact idea. There is enough in the testimony to show, that before the use of the word by the plaintiffs or their assignors, it had so entered into our common language as to have found a place in a standard dictionary thereof. It is there defined thus : " Combined or impregnated with phosphorus." The testimony also shows that it partook so much of a scientific character as to have been given a place in a medical lexicon, by Robert Hooper, M. D., published in 1824, and in another medical lexicon, by the same author, published in 1832. This was sufficient to sustain a finding of fact, that the word was in common use, and was recognized by scientific men. Nor is the question, whether the name used as a trade mark will convey an exact notion of how to compound an article, so that one reading it may be able to make a like article. If the necessary effect is to inform the reader or hearer of the general characteristics and composition of the thing, it is a name which may be used, with equal truth, by any one who has made and offers for sale a thing compounded of the same ingredients, and who desires to express to the public the same facts. Nor does the coupling together, in a new combination, of words which before that had been used apart, and had entered into the common or scientific vocabulary, give a right to the exclusive use of such combination, where it is indicative not of origin, maker, use and ownership alone, but also of quality and other characteristics. As it does appear from the testimony in this case, that the phrase claimed by the plaintiff is formed of words in use before the adoption thereof by them; that they were then and are now indicative, not of origin, use and ownership alone, but also of characteristics, quality and composition, the plain-

tiffs may not be protected in the exclusive use of it as a trade mark.

The testimony would have sustained a finding of fact to that purport; and such finding would sustain the conclusions of law made by the learned referee.

According to settled rules, this leads to an affirmance of his judgment.

All concur.

Judgment affirmed.