ENOCH MORGAN'S SONS' COMPANY, RESPONDENT, *v.* BENJAMIN F. TROXELL AND OTHERS, APPELLANTS.

*Trade-mark — what it may consist of — character of buyers to be considered, in determining whether they will be deceived.*

A trade-mark is not necessarily limited to a device or name, but may consist of any marks, forms or symbols which serve to designate the true origin or ownership of the article.

It is sufficient to justify the interference by injunction of a court of equity, to show that there is a fraudulent intention on the part of the defendants to palm off their goods as those of the plaintiff, and that such intention is being carried into execution.

In determining whether buyers are likely to be deceived by the defendants, the character of the article sold, the use to which it is to be applied, the kind of people by whom and the manner in which it is bought, are all to be considered.

The plaintiff had for many years sold a polishing soap, put up in cakes, wrapped

in paper, coated with tin-foil, and having around the edge of each cake a blue paper band, with gilt letters printed thereon. On each cake was stamped the words "Enoch Morgan's Sons' Sapolio." Thereafter the defendants prepared and sold a soap which they put up in cakes, wrapped in tin-foil, and having a blue paper band around them, similar to those used by the plaintiff, upon which were stamped the words "Troxell's Pride of the Kitchen Soap." It appeared that the defendants sold and delivered the soap so put up, to grocers, with the intent that it should be, and the same was, in many cases, sold as "Sapolio."

*Held,* that the defendants should be enjoined from so preparing and selling the said soap.

APPEAL from a judgment in favor of the plaintiff, entered on the report of a referee.

The action was brought to restrain the defendants from using a trade-mark alleged to belong to the plaintiff.

The referee found among other things, that the plaintiffs and their predecessors had invented and prepared a new manufacture of soap, especially designed for cleaning and polishing; and to indicate the origin and genuineness of their said fabrication and manufacture, they originated, devised, and for the first time applied as a trade-mark the word "Sapolio," a device of a human face reflected by a polished pan; a uniform size and form of cake; a uniform cream color therefor, the stamp thereon of the words, "Enoch Morgan's Sons' Sapolio;" an envelope or wrapper therefor of Argentine foil covered manilla paper, having printed on the inside thereof, in black type upon a cream colored ground, certain devices and words, and a band of ultramarine blue paper for encircling the said cakes when so enveloped and wrapped, on which certain words were printed in gold letters; and a style of packing said cakes, so enveloped and bound, in boxes twelve inches long, ten inches wide and nine inches deep, in which such cakes were packed upon their sides, exposing to the eye of the buyer the Argentine foil paper crossed by said band in printed gold letters. Having invented said manufacture, and having devised and applied thereto the said trade-mark, the said firm immediately commenced to advertise the same very extensively and expensively, and in the said advertisements called the attention of the public to their trade-mark, and to the specific details thereof, as the distinguishing marks which they had originated and appropriated to identify the said soap as the

genuine and proper manufacture of the said firm, and by means thereof assured the public desiring to purchase the manufacture of the said firm, that if they purchased soap so marked they would purchase the soap which they desired; and by means thereof also endeavored to assure for themselves the right that the soap so bought by the public should be sold for the profit and benefit of the said firm. The said soap, by reason of its intrinsic value, and of the said advertisements, became and was, and is, widely known under the marks aforesaid, and so bearing the same, has since been and is now largely adopted, purchased and used by the public as the genuine soap so first manufactured and introduced by the said firm; and the business of manufacturing and selling the same under the marks aforesaid has been and is largely pecuniarily valuable. That the said defendants have, since the 1st day of January, 1874, well known the premises, and since that date have wrongfully and fraudulently endeavored, and are now constantly in like manner endeavoring unlawfully, to avail themselves of the benefit of the said advertisements, and of the popularity and reputation of the said manufacture, and of the trade-mark under which the same has been and is now sold, and have unlawfully and fraudulently simulated the said cake, and simulated and appropriated the said mark, and are now so unlawfully and fraudulently simulating the same and each thereof, and are now, and for a long time past have been daily engaged in unlawfully and fraudulently selling their said simulated manufacture under said appropriated marks, as and for the genuine manufacture of plaintiff; and said simulated manufacture and appropriated trade-mark have a tendency to deceive, and do deceive the public, exercising all the caution which purchasers usually exercise, and induce it to purchase said simulated manufacture of the defendants, to the great deception of the public, and to the great injury of the plaintiff. The said defendants now expose and offer for sale, and sell soap in said simulated form, and with said simulated color, in envelopes and wrappers, and have crossed and now cross each cake of soap when so enveloped and wrapped with the ultramarine blue band and gold letters. The said defendants, in addition to the deception and fraud upon the public, and upon the plaintiff practiced by said fraudulent and deceptive simulation, and as the means and mode of getting

their said manufacture upon the market, and to induce the retail grocers by whom it is sold by retail to the various persons wishing to purchase for use the said manufacture of the plaintiff, to purchase of the defendants their said manufacture, and sell the same by retail to their customers and to the public, as being the said manufacture of said plaintiff, represented to said retail grocers, and induced them to believe that the public would not know the difference between the two, and that the defendants' said manufacture could be sold by them as being that of the plaintiff wherever the latter could be sold; and so represented and induced said retail grocers to believe, with the intent that they should, and in the expectation and belief that they would, fraudulently sell to their customers and the public wishing to purchase, and applying to purchase the said manufacture of the said plaintiff, the said manufacture of the said defendants as being, and believing that it was the said manufacture of the said plaintiff. And the said retail grocers have at all times, in pursuance and execution of the said fraudulent intent of said defendants, sold, and now continue by means of said deceptive and fraudulent simulation to sell the said manufacture of the defendants, purchased by them of the defendants as aforesaid, and upon the representations aforesaid, to their customers and to the public, as being the said manufacture of the said plaintiff, and did and do thereby deceive and defraud such purchasers, who are thereby fraudulently induced to believe, and do believe, that they are purchasing the said manufacture of the said plaintiff. The said several acts of the said defendants were deliberate, willful and fraudulent in intent, and actually misled and deceived, and continue to mislead and deceive the public, and defraud the plaintiff.

*E. More*, for the appellants.

*John H. Hull*, for the respondent.

Barrett, J.:

My impressions upon the argument of this case were that the referee had gone too far. There seemed to be considerable dissimilarity between the respective packages of "Sapolio" and "Pride of the Kitchen" submitted for our examination. It did not appear

probable that any person of intelligence could, even upon a casual inspection, mistake the one for the other. Upon the one, "Enoch Morgan's Sons' Sapolio," printed in gilt letters, met the eye. Upon the other, "Troxell's Pride of the Kitchen Soap." Indeed, the principal similarity, aside from the form and size of the cake, was the wrapper of tin-foil paper, encircled by a band of ultramarine blue. The further question suggested itself to my mind, could the plaintiffs appropriate this peculiar combination of tin-foil paper, with an ultramarine blue wrapper and gilt letters printed thereon, and by applying it to scouring soap, secure a trade-mark therein?

A careful examination of the evidence and further reflection have removed these impressions, and led me to the conclusion that the learned referee's judgment was not only just but sound in law. Whatever there is of dissimilarity in the two articles is but seeming. While there is an almost ostentatious display of variation in matters not likely to attract the attention of the casual purchaser, there is substantial similarity in the picture to which the eye has become accustomed. In this connection, we must not lose sight of the character of the article, the use to which it is put, the kind of people who ask for it, and the manner in which it is ordered. Very broad scene painting will deceive an ignorant, thoughtless or credulous domestic, looking for an article in common and daily use, and of no particular interest to her personally. The same kind of deception would be instantly detected by an intelligent woman of the world, looking for her favorite perfume, soap or dentifrice, or by a man of luxurious tastes, inquiring for some special brand of champagne. Now, the evidence in the case is clear and abundant that the "Pride of the Kitchen" was sold by many grocers as "Sapolio," and that many housekeepers were actually deceived. Nor can there be any doubt, we regret to say, that the "Pride of the Kitchen" was delivered by the defendants to these grocers, with intent that it should be so sold as "Sapolio." It was thus the defendants' purpose to take advantage of the market secured by the industry of the plaintiffs and their predecessors, and by a large expenditure of time and money. They thus determined, by selling their goods as the goods of the plaintiffs, to build up a business in scouring soap upon their neighbors' labor and capital. It would be a reproach to the administration of jus-

tice if the execution of this purpose could not be checked.. It is said that the plaintiffs cannot monopolize the use of tin-foil nor of blue paper. This is quite true, but it does not meet the question. The plaintiffs do not seek to monopolize tin-foil nor blue paper. Any one may use these articles and use them freely. They may be applied to any other soap. They may even be applied to scouring soap. All that the plaintiffs ask is that they shall not be applied to scouring soap in such form and manner, with such peculiar relations to each other and to the cake, as to deceive that special public which relied upon similar methods long since adopted by the plaintiffs and their predecessors.

A trade-mark is not necessarily limited to a device or name, nor are we prepared to admit that a party cannot be protected in the combined arrangement of form and distribution of color with which his goods are put up and placed before the public, especially where there is a fraudulent purpose, and where customers have in fact been deceived. If the plaintiffs cannot be protected in a "pressed and stamped cake inclosed in a tin-foil wrapper, encircled with an ultramarine blue band, printed in gold," neither can they, though other and still more novel, distinctive and striking forms and colors be added. There might be double and treble bands of various colors and sizes, crossing each other in different places, with the margins cut or stamped in different shapes and styles, yet if the defendants' contention be well founded the plaintiffs could not be protected against their fraudulent reproduction. According to this doctrine, it is only necessary for the dishonest trader to avoid the use of some special word or device to which the *technical name* trade-mark has been given, and to gain his piratical end by imitating everything which really conveys to the public, belief in the genuineness of the article sought. It must have been this shallow as well as unworthy idea which was in Troxell's mind, when he declared his purpose of imitating "Sapolio" as closely as possible without absolutely making himself liable.

The law of trade-marks has been gradually expanding so as to meet just such cases. The courts in a long and unbroken line of decisions have endeavored to uphold and enforce commercial morality, and have afforded their protection to honest enterprise and skill. It will not be necessary to go over these cases. They have,

in fact, become too numerous for extended analysis. It will be sufficient to cite a few of the prominent ones (*Popham* v. *Cole*, 66 N. Y., 74; *Colman* v. *Crump*, 70 id., 578; *Gilman* v. *Hunnewell*, 122 Mass., 148; *Woollam* v. *Ratcliff*, 1 H. & M., 259; *Hope* v. *Evans*, 3 L. T. [N. S.], 294; *Wotherspoon* v. *Currie*, 27 id., 308; *Perry* v. *Truefitt*, 6 Beav., 66; *Croft* v. *Day*, 7 id., 84; *Williams* v. *Johnson*, 2 Bosw., 6), and to state the general result which has been arrived at, so far as may be applicable to the case at bar. We deem it then to be well settled upon authority, that to justify the interference by injunction of a court of equity, it is sufficient that there is a fraudulent intention of palming off the defendants' goods as those of the plaintiffs, and that such intention is being carried into execution.

*Caswell* v. *Davis* (58 N. Y., 223) is supposed by the appellants to conflict with this position, but we think without reason.

All that was held in that case was, that there can be no trademark in words or phrases in common use, which merely denote the character, kind, quality and composition of an article. Consequently the name "Ferro Phosphorated Elixir of Calisaya Bark" could not be protected. But there was no suggestion that the defendant would have been permitted to palm off upon the public his own preparation of Ferro Phosphorated Elixir of Calisaya Bark, as that of the plaintiffs, had the latter given their preparation any name exclusively indicative of origin or maker. If the plaintiffs there had called their medicine "Caswell's Ferro Phosphorated Elixir of Calasaya Bark," or "Caswelline," the defendant certainly would not have been permitted to palm off his elixir as that thus characterized. Nor would he have been permitted by the imitation of Caswell's labels, signs, marks or other symbols to effect the same purpose. The Caswell case simply applies the well-known doctrine that a trade-mark cannot consist of anything which merely denotes the name or quality of the article, and that, as was said by Judge DUER in the Amoskeag case (2 Sand., 609): "It is not enough that the public may be misled, or has been misled. As already intimated, the resemblance must arise from the imitation or adoption of those words, marks or signs which the person who first employed them had a right to appropriate as indicating the true origin or ownership of the article or fabric to which they are

attached." It does not disturb the rule that a trade-mark may consist of anything — marks, forms, symbols — which designates the true origin or ownership of the article. (*Godillot* v. *Hazard*, 49 How., 5.) That the label as a whole is entitled to protection. (*Kinney* v. *Basch*, 16 Am. Law Reg., 597.) Also the packages, cases and hand-bills. (*Kinney* v. *Basch*, *supra*; *Williams* v. *Spence*, 25 How., 366; *Cook* v. *Starkweather*, 13 Abb. [N. S.], 392.) Also the wrappers. (*Lea* v. *Wolff*, id., 389.)

The true rule is well stated in the late English case of *Mitchell* v. *Henry* (43 Law Times [R. N. S.], 186). There the plaintiff's trade-mark consisted of "a white selvage on each side of the piece, having a red and white mottled thread interwoven the full length of the selvage between the edge of the piece and the edge of the selvage." The goods sold by the defendant had "a black or very dark selvage; the plaintiff's being white or nearly so, and the defendants' had an interwoven thread made up in their goods composed of red, white and yellow strands placed at the edge of the piece, between the piece and the selvage." Upon that state of facts Lord Justice JAMES observed, "the Master of the Rolls seems to me to have considered that when he had satisfied himself, on the examination of the things before him, that the twisted thread in the defendants' selvage was in a position different from that of the plaintiff's, and that the plaintiff's selvage could not be said to be white, then that determined the question. I am bound to say that to me the question is not whether the selvage is white, but whether it was what the trade knew as white selvage; whether anybody connected with the trade could have any doubt whatever as to what was meant by white selvage. Then it is not at all conclusive to my mind whether the position of the defendants is the same or different from the position of the plaintiffs. It resolves itself into the old question, which has always been the question to be determined in these cases — are the defendants, not in words, but by acts and by something on the face of the articles, representing their goods as being the goods of the plaintiffs? That is to say, are they using something which is calculated to pass off their goods as the goods of the plaintiffs?"

The same doctrine, in substance, was expressed and an injunction allowed by Mr. Justice LAWRENCE in *Enoch Morgan's*

*Sons* v. *Schwachhofer* (55 How., 38), a case very similar to the present.

The fact that the imitation is but partial cannot avail the defendants. The question is whether such a general resemblance remains as is designed to mislead the public (*The Amoskeag Case*); and of that, as we have seen, there can be no doubt. It all comes to this, that, as was said in *Perry* v. *Truefitt* (*supra*), "a man is not to sell his goods under the pretence that they are the goods of another." The law does not limit the form of the pretence; that depends upon the facts of each particular case. Here that element is clearly present, both in the picture presented to the public eye and in the facts disclosed by the witnesses. The fraud, for such it was, was long planned, and its execution proceeded by regular and steadily advancing steps; when it was found that bars of soap were unsatisfactory a pressed and stamped cake was resorted to. Then we have the polished pan and the face reflected therein with the variation of a monkey for a man. Then came the various colored bands, none of which were found to answer the fraudulent purpose, culminating at last in the plaintiff's ultramarine blue. What was done was done artfully with a view to reach thoughtless and ignorant buyers, and yet to evade the law by an apparent exhibition of mere rivalry. It was also done shrewdly by enlisting the retail grocers, through the bait of reduced prices and increased profits, thus making allies of these men for the general diffusion of direct misrepresentation. It will not do to call this enterprise and energy, nor to stigmatize the demand for protection against such practices as an effort to limit legitimate competition and to promote monopoly.

We find no error in the rulings of the learned referee upon any of the other questions presented, and we think that the judgment should, therefore, be affirmed, with costs.

DAVIS, P. J., and BRADY, J., concurred.

Judgment affirmed, with costs.