THE ELECTRO–SILICON COMPANY, Appellant,. *v.* EDWARD C. HAZARD and FRANK GREEN, Respondents.

29 369
142a 477

*Trade-mark — what words may be adopted and used as.*

The plaintiff and its predecessors had for the past twenty years been engaged in preparing and selling a finely pulverized white powder, which they called electro-silicon, and which was used for polishing gold, silver and other metals. It appeared that the preparation, which was made from an infusorial earth, was first prepared by the plaintiff's predecessors, and sold by them under the name of electro-silicon, and also of silicon, these words being coined for and adopted by them as a trade-mark, a declaration to that effect being filed in the office of the secretary of State of California and in the Patent office at Washington. The powder was sold for many years, and became valuable for the purpose for which it was designed.

The words electro-silicon or silicon are not descriptive of the article, although it contains some silicon, in the form of silica, or silicic acid; silicon itself is not, and from its nature cannot be an article of commerce; it exists in very minute quantities, and is an elementary body closely allied to carbon, existing as a dark brown powder or steel gray mass, according to circumstances; it is never found in an uncombined state, but only as a component part of compounds, resembling it in no respects, from which it has been separated in very small quantities to furnish specimens for cabinets:

*Held*, that the plaintiff had, by its adoption and use of the words as a trade-mark, acquired a right so to ;use them, and that it was entitled to restrain their unauthorized use by the defendants.

Appeal from an order of the Special Term denying a motion to continue an injunction.

*Philo Chase*, for the appellant.

*Hugh Porter*, for the respondents.

Brady, J.:

It appears from the papers submitted upon this appeal that about twenty years ago a company in California, called the Electro-Silicon Company, began to put up for sale the article now sold by the plaintiffs under the name of electro-silicon. The company, for the purpose of designating and distinguishing and, indeed, identifying its article with itself as the manufacturer and proprietor, gave to it its own name, electro-silicon, with the two words united so as to form a compound word, and determined to use this word as its trade-mark.

The original proprietor caused the term thus coined to be registered as such in the office of the secretary of State of California and in the patent office of the United States at Washington. There was a change of ownership, but the successors of the company, Coffin, Reddington & Co., and the plaintiffs, who became the owner, put up the article with the compound title printed upon its boxes and labels.

It also appears that the article thus designated has acquired a high reputation, and is extensively sold throughout this country and to a considerable extent in Europe, and that the plaintiff and its predecessors expended large sums of money in advertising and creating the business which is done in the article under the name mentioned, and further that when the original proprietor adopted the compound name mentioned as a trade-mark for its article, no other article of trade had ever been called by the name adopted, or by the designation "silicon" and that no article of polishing powder besides the plaintiffs' had been sold in the market by the name of "electro-silicon" or of "silicon," except the defendants', which has recently been put upon the market, save an article which was sold under the same name by two persons named Trask and Levy, both of whom were enjoined soon after the infringement was discovered and alleged. It also appears that the plaintiff's article has heretofore been sold by the defendants, and further that it is not only known by the name of "electro-silicon," but by "silicon" alone, by which term it is often called for by consumers. The article itself is a white, finely pulverized powder composed of infusoria, *i. e.*, deposits of minute animals found in the State of Nevada and in some other places, and showing when analyzed the chemical element silic acid, or silicon, plus oxygen in a large proportion.

It is said by Professor Chandler, who subjected some of it to chemical analysis and microscopical examination, to be what is called infusorial silica; that it is composed of silicon skeletons, or shells of microscopic organisms, called "infusoria," chemically consisting chiefly of silica, with a certain quantity of water and a little oxide of iron, its proper name in the language of science being "infusorial earth," or "infusorial silica," or, speaking chemically without any reference to its origin, "silica;" and he says that the name

" silicon " is entirely improper as a scientific name for the substance, or as giving a true idea of its chemical composition, for the reason that silicon is an element most nearly resembling in its chemical character the element carbon.   He further says that this silicon is not a commercial article; it is only known as a chemical curiosity in the laboratory, and is never sold except as a chemical curiosity in very small quantities, for teachers of chemistry to exhibit to their pupils, and that it appears either as a dark brown powder, as black lustrous plates, or in dark needle-shaped crystals, and never resembles, in any way, the substance known as " silica; " and further, that silicon is never found as a natural material.   It occurs in nature only in chemical combination with other substances as a constituent of various minerals, such as the emerald, the topaz, the garnet, etc., and that it has no commercial value, and is not, properly speaking, an article of commerce.

And Mr. Morton, who is president of the Stevens Institute of Technology, in Hoboken, New Jersey, and who formerly occupied the chair of chemistry in the University of Pennsylvania, at Philadelphia, and who, for more than twenty years, has devoted himself to the study and practice of chemistry, stated that he received a lump of infusorial earth, of which he made an analysis and which he also examined with a microscope, and found that it was in fact a material known as infusorial earth, consisting of minute fragments of the silicon skeletons of infusoria, and that its composition was essentially silica, containing also a little water and some oxide of iron. And he further said, to designate this article in its natural or manufactured state, silicon would be, in a scientific sense, entirely improper and indeed absurd, and would be in no wise descriptive of the material here in question, which would certainly not be recognized by that, because silicon is the proper name and designation of one of the elementary bodies closely allied to carbon, and existing as a dark brown powder, or steel gray mass, according to circumstances.   The proper name of the article examined by me as above and herewith produced is infusorial earth, and in chemical composition it is essentially silica.

And in a second affidavit he said that for the fuller exposition of the subject he desired to add that the " silicon " described by him in his first affidavit is never found in nature in an uncombined state,

but only exists as a component part of compounds resembling it in no respect. It has been separated from such compounds so as to exist by itself, only in a very small way, so as to make specimens for exhibition in chemical cabinets, and has never been so produced in any quantity, and is entirely unknown as an article of commerce. The entire amount of silicon existing in all the cabinets of the world would not probably exceed a few pounds.

The only professional chemists examined on behalf of the defendants, in response to the facts thus detailed by Professors Chandler and Morton, was Professor Doremus, who is a known authority in matters of chemistry; but the learned professor does not controvert these allegations. He says that the article under consideration is known to science under various names, such as infusorial earth, infusorial silica, and silica; that it is also known to science as an oxide of silicon, *i. e.*, silicon in combination with oxygen, and that while not pure silicon, yet, in view of the large quantity of silicon it contains, he regards the word silicon as reasonably descriptive of the same in a commercial sense; that it is a matter of common occurrence to find in the market an article of merchandise the popular name of which is not scientifically accurate, and as an example of this he said: "We find that the white oxide of arsenic known to the public as arsenic, and sold under and by that name, whereas arsenic is an element like silicon;" and, further, that "the candles known in the market as stearine candles, and commonly sold under and by that name, are not made of stearine but from stearic acid; and candles known in the market as wax candles, and commonly sold under and by that name, are made of paraffine and contain no wax."

The professor, therefore, so far as he may be regarded as departing from the conclusions at which Professors Chandler and Morton arrived, must be said to be presenting his views in an argumentative form, and they have not for that reason the force of the depositions made by these experts. It is quite apparent from the statements of both of these gentlemen, and particularly from that of Professor Morton, that silicon is not a word descriptive of the article which is put up by the plaintiffs. He says: "As we have seen that the amount of silicon existing in all the cabinets of the world would probably not exceed a few pounds; and, of course,

obtainable in such limited quantities and being the result of chemical combinations and the product of the laboratory, it would be impossible for it to become an article in commercial use.

The words electro-silicon cannot, therefore, be regarded as descriptive of the article which is sold by the plaintiff.

In confirmation of this conclusion we find that in Webster's Dictionary the word silicon is defined to be a dark, nut-brown elementary substance, destitute of metallic lustre and a non-conductor of electricity; it is the base of silax or silica. And the definition of silica, according to the same authority, is a silicic acid in a state of purity. Indeed, in the action brought by the *Electro-Silicon Company* v. *Trask* (59 How. Pr., 189), Justice Van Vorst has stated in his opinion, as appears in this case, that the words electro-silicon are a combination wholly arbitrary and coined for the purpose of creating a trade-mark. And it is stated in the affidavit of Mr. Levy, which was read on behalf of the defense, that in the action brought against him by the Electro-Silicon Company, and decided by Justice Van Vorst, the learned justice found that the article electro-silicon was a white, finely pulverized powder, as already stated, and, further, that the name given to it was an arbitrary one coined for the article and not expressive of the nature or quality thereof, except that silicon is one of its principal chemical elements, and he suggested that the word electro was probably designed to express the rapidity with which the polish was attained by its use.

It thus conclusively appears that a preparation made from infusorial earth for commercial purposes was first introduced by the plaintiffs' predecessors and called electro-silicon; that these words were adopted as a trade-mark and a declaration thereof filed in the office of the Secretary of State of California and in the patent office of the United States at Washington; that for many years it was sold and became valuable for the purpose for which it was designed; that it was known as electro-silicon, and also as silicon only; that the words electro-silicon were coined for the purpose of creating and establishing a trade-mark; that they are not descriptive of the article although it contains some silicon; that silicon is not, and from its nature cannot be, a commercial article because it exists in such minute quantities, and is, as we have seen, an elementary body closely allied to carbon and existing as a dark-brown powder or

steel-gray mass, according to circumstances, and is never found in nature in an uncombined state, but only exists as a component part of compounds, resembling it in no respects, from which it has been separated so as to exist by itself only in a very small quantity and to furnish only specimens for cabinets. The question presented upon this state of facts is whether the plaintiff has acquired any right of property in the trade-mark mentioned, namely, electro-silicon.

There are a great many cases illustrative of the rules of law governing the rights acquired by trade-marks, and it may be said that in some respects they are conflicting; but the ultimate object of the courts has been, in all of them, not only to protect and encourage honest competition, as a matter of public policy, but to condemn anything like dishonest traffic, or fraudulent or unjust attempts to invade existing rights. In the case of *Messerole* v. *Tynberg* (decided in the Court of Common Pleas in 1868, and reported in 4 Abb. [N. S.], 410) the question was whether the plaintiff's trade-trade, which consisted of the word " Bismarck," was one which could be used by others, though it was a popular term and was in general use. In that case the subject was examined at some length, and it was held that whilst the word used might not be the subject of special right or property, it might become so when the application of it identified a particular article. The case of *McAndrew* v. *Bassett* (10 Jur. [N. S.], 550), was cited in that case, in which Lord WESTBURY said that " property in the word for all purposes cannot exist, but property in that word as applied by way of stamp upon a stick of licorice, does exist the moment the licorice once gets into the market so stamped ; and obtains acceptance and reputation in the market, whereby the stamp gets currency as an indication of superior quality, or of some other circumstance that render the article so stamped acceptable to the public."

And in the case of *Matsell* v. *Flanagan* (2 Abb. [N. S.], 459), it was held that a court of equity would protect a person in the use of a trade-mark, *e. g.*, the name of a newspaper, although the name adopted was one that belonged to the language of the country, and might be employed in any way or for any purpose which would not defraud individuals or deceive the public. But the case of *Hier* v. *Abrahams* (82 N. Y., 519) is regard as conclusive upon the right of the plaintiff herein to an injunction. In that case the action was

brought to restrain the defendants from infringing upon the plaintiff's alleged right to the use of the word " pride " as a trade-mark, and the court declared that there were trade-marks of two kinds — pictures or symbols, or a peculiar form and fashion of label, or simply of a word or words, which in whatever form printed or represented, continued to be the distinguishing mark of the manufacturer who has appropriated it or them, and the name by which his products were known and dealt in, and that this distinction was recognized in the statutes for the protection of trade-marks as well as in the cases. It was said that where the trademark consisted of a picture or symbol, or in any peculiarity in the appearance of the label, the imitation must be such as to amount to a false representation, liable to deceive the public and enable the imitator to pass off his goods as those of the person whose trademark was imitated. But where the trade-mark consisted of a word, it might be used by the manufacturer who has appropriated it, in any style of print, or on any form of label, and its use by another in any form was unlawful; that the goods became known by the name or word by which they had been designated, and not merely by the manner or fashion in which the word is written or printed, or the accessories surrounding it, and the unlawful use of the name or word in any form might be restrained. The learned judge in delivering the opinion refers to the several cases in which the right of trade-mark was preserved where it consisted of a word, and declared that it was not necessary to the preservation of the plaintiff's rights by injunction that an actual intent to defraud should be established; that the violation of their rights in the conversion of the trade-mark in legal contemplation was a fraud, and if the defendants, with a knowledge of those rights invaded them and caused damage, that would justify an intendment, if one were necessary, that they did so with intent to defraud.

The learned justice in the court below denied the motion to continue the injunction upon the authority of the case of *Morgan Sons* v. *Troxell* (11 Abb. N. C., 86); but the question discussed herein was not in issue in that case. The gravamen of the plaintiff's complaint there was a simulation of the form of package and the color of the labels used in connection with the article, and the court held, substantially upon an inspection of the different packages, that

there was such difference in them that the plaintiff's charge could not be sustained. The plaintiff in this case does not defend upon the charge of simulation, but upon the right of property acquired in words designating the article sold and which were adopted as a trade-mark, and therefore the element of intent to defraud does not necessarily enter into the consideration of the case. It might be, under various authorities, that if the words used were merely descriptive of the article sold, the plaintiff could not successfully assert and maintain an exclusive right to use them, such for example as " Dr. Johnson's Yellow Liniment" (*Singleton* v. *Bolton*, 3 Douglas, 293), " Thompsonian Medicines " (*Thompson* v. *Winchester*, 19 Pick., 214), " Schiedam Schnapps " (*Wolfe* v. *Goulard*, 18 How. Pr., 64), " Dessicated Codfish " (*Town* v. *Stetson*, 3 Daly, 53), " Julienne Soup " (*Godillot* v. *Harris*, 81 N. Y., 263), where the right asserted was not maintained because the names were not new and distinctive, but were old and appropriate of a certain class of goods, or had been previously sold by other dealers, the names being generic and therefore descriptive. The plaintiff's claim might be disregarded also if the designation merely described the material or composition of the article sold, such as " Paraffine oil " (*Young* v. *Macrae*, 9 Jur. [N. S.], 322), or " Ferro-Phosphorated Elixir of Calisaya Bark " (*Caswell* v. *Davis*, 58 N. Y., 223), or if the trade-mark merely indicated the place of manufacture, as for example, " Lackawanna Coal " (*Canal Co.* v. *Clark*, 13 Wall., 311), or " Glendon Iron " (*Glendon Iron Co.* v. *Uhler*, 75 Penn. St., 467), or " Durham Tobacco " (*Blackwell* v. *Wright*, 73 Sup. Ct., North Car., 310).

But as we have seen, it conclusively appears that neither the words in combination nor singly employed, describe the article which they are intended to designate. It is a substance for polishing composed of infusorial earth, the proper description of which is not silicon, which exists in small quantities and is not an article of commerce. The words, therefore, are arbitrary and coined for the purpose of distinguishing an article which the plaintiff's predecessor first introduced into the commerce of the nation of which it has become a part.

In conclusion it may be said, as suggested by the counsel for the appellant, with great propriety, that silicon or electro-silicon is not,

as already stated, descriptive of the plaintiff's article. It is not a descriptive name of a class of polishing powder, or the appropriate descriptive name of the material of which it is composed, or the place of its manufacture or production, or of the nature of the thing itself, or of the quality of the thing itself, or of the mode of its use, or of the mode of its construction, but is new, arbitrary and distinctive; and under the authorities referred to it is quite clear, therefore, that the plaintiff is entitled to the exclusive use of the trade-mark for the purpose designated, having acquired by its use a property in it.

For these reasons the order appealed from should be reversed, and the motion granted, with ten dollars costs of the appeal besides disbursements, and ten dollars costs of the motion below.

Davis, P. J.:

My brother Brady has presented his views of this case with such admirable force and clearness, and pointed out the distinctions between the question in this case and those upon the authority of which the motion was disposed of in the court below, that I concur with his conclusions without hesitation, although on the argument I was of the impression that the authorities cited by the respondent, would require an affirmance of the order denying the injunction. I think the injunction should be granted.

Present — Davis, P. J., and Brady J.

Order reversed, and motion granted, with ten dollars costs and disbursements, and ten dollars costs of motion below.