## DALE *a.* SMITHSON.

*New York Common Pleas; General Term, February,* 1861.

### TRADE-MARK.—INJUNCTION.

The right of plaintiffs to maintain an action for a violation of a trade-mark, does not depend upon the defendant's intention to violate it. It is enough that an actual violation is shown.

Although a fraudulent and deceptive trade-mark is not to be protected by injunction, yet the fact that a trade-mark bears a fictitious name as the name of the manufacturer of the article, does not affect the owner's right to protection, where it is shown that it is not used with any fraudulent intent, and does not in fact deceive the public.

The action was brought to restrain an infringement of plaintiff's trade-mark. Judgment was rendered for the plaintiffs, from which defendants appealed.

*Robert Gillen*, for the appellants.

*Martin & Smiths*, for the respondents.

By THE COURT.*—HILTON, J.—The right of the plaintiffs to maintain this action does not in any degree depend upon the inquiry as to whether the defendants intended to appropriate to their use a trade-mark or label, known by them to have been devised and employed by the plaintiffs in their business; but it is enough if it is made to appear that the defendants have done the act complained of; and this is so, although they may have used the mark in ignorance of its being the exclusive property of any one. (Millington *a.* Fox, 3 *Myl. & Cr.*, 338.)

From the testimony at the trial of this case, it abundantly appears that the plaintiff, Thomas Nelson Dale, being engaged in the sale of thread, procured a certain quality of that article to be manufactured for him exclusively, to which he affixed a label or mark devised by him, and by which the thread thus manufactured has become well and favorably known in the market as the thread of the plaintiffs, who have succeeded to the rights of Dale in respect to the mark thus devised and employed. The label so contrived and affixed to each package of thread so manufactured is as follows: .

COURTRIA FLAX.
THOMAS NELSON & CO.
WARRANTED.
FAST COLORS & 16 Oz.

And the label adopted by the defendants, and used by them in a similar manner upon their thread, so closely imitates the plaintiff's, as to leave not the slightest doubt as to the intent with which the imitation was made.

But it is contended that the plaintiffs cannot acquire an exclusive right to the use of this label, because it does not indicate the true origin or ownership of the thread to which it is affixed —the name of Thomas Nelson & Co. being that of a fictitious firm; and as the plaintiffs are in this manner practising a de-

Dale *a.* Smithson.

ception upon the public, by passing off the thread as being manufactured by parties who have no actual existence; consequently, it is claimed that a court of equity should not interfere to protect them in their fraud.

It is undoubtedly true that a court of equity will not interfere preliminarily by injunction, and protect a person in an exclusive right to a trade-mark or label manifestly devised and intended to cheat the public in the purchase of the article to which it may be attached, by representing the thing to be a different substance or compound from that of which it really consists (Pidding *a.* How, 8 *Simons*, 477; Singleton *a.* Bolton, 3 *Doug.*, 293; Perry *a.* Truefitt, 6 *Beavan*, 66), or by stating untruthfully its origin, properties, or qualities; but it may be remarked that in each of the cases cited, and in which this rule originated, the label was obviously intended to cheat and deceive the public, and the articles to which they were affixed were, to say the least of them, of very doubtful character and quality. Thus, in Pidding *a.* How, the label was attached to a mixture of tea, which was represented to have been compounded by an eminent Chinese merchant, named Howqua, and the peculiar flavor of the compound was stated to be derived from the use in it of a very rare and high-priced tea, grown only in one province of China, and which could not be procured in England at any price. The facts, on the contrary, were that the mixture was made up of ordinary teas purchased by the plaintiff in England, and that Howqua neither made nor used any such compound.

Yet, under these circumstances, Vice-chancellor Shadwell merely declined to interfere by injunction in the first instance to protect the plaintiff in the use of his trade-mark until his right to it had been established at law,—thus clearly leaving it to be inferred that when the legal right had been so established, the protection would be afforded.

Perry *a.* Truefitt was a much more flagrant case of deception. There, the label was attached to a nostrum denominated the "Medicated Mexican Balm, for restoring, nourishing, strengthening, and beautifying the hair." It was represented to be a "vegetable balsamic production of that interesting but little known country, Mexico," possessing extraordinary qualities for preserving, restoring, and beautifying the hair, and

"made from an original recipe of the learned J. F. Von Blumenbach, and recently presented to the proprietor by a very near relative of that illustrious physiologist." So far from all this being true, it appeared that the only difference between the plaintiff's mixture and that of the defendants in that case was, in the latter being composed of lard and olive-oil, perfumed with essential oils, while the former did not contain lard, or any animal fat; the representations as to the origin or quality or proportions of the article being wholly false. The master of the rolls, Lord Langdale, in refusing the injunction then applied for, put it upon the ground that it was "not a favorable case for a person to come in the first instance and claim the assistance of a court of equity in aid of a legal right," which, however, he did not deny he might have. The case, therefore, stood over, to enable the plaintiff to bring an action at law, for the purpose of establishing such a legal right.

Singleton *a.* Bolton was a decision prior in point of time to either of the above. The case arose in 1783, respecting the right of the plaintiff to the exclusive manufacture of a medicine called "Dr. Johnson's Yellow Ointment," which his father had sold for many years, and after whose death the plaintiff continued to sell in the same way. The defendant made and sold a similar article. The case was tried before Lord Mansfield, who ordered a new suit, which he subsequently sustained, upon the ground that the plaintiff showed no property in him, "there being no patent nor any letters of administration."

From these authorities the rule has been deduced which I have stated, and the courts have uniformly adopted and applied it. (Fetridge *a.* Wells, 4 *Abbotts' Pr.*, 144; Fetridge *a.* Merchant, *Ib.*, 156; Wolfe *a.* Goulard, 18 *How. Pr.*, 64.)

But it cannot, I think, be said that any of these cases, and which were cited and relied on by the defendants' counsel at the argument, operate in any degree against the plaintiffs' right to an affirmance of the present judgment. Here, the title to the label or trade-mark in question has not only been legally established upon a formal trial, but, in addition, the label is manifestly one not intended to delude the public in the purchase of an article by making any representations or asserting any thing in respect to its qualities or properties, which are untrue; therefore it cannot be said that in protecting the

plaintiffs in its use, we are assisting in the perpetration of a fraud. It is not contended that the thread to which this label is affixed is an article without merit; while, on the contrary, the testimony at the trial fully established the fact, that by its excellence it had acquired a valuable celebrity among dealers, and besides, has become well known as the thread of the plaintiffs. (Stewart *a*. Smithson, 1 *Hilt.*, 119.)

It is, however, insisted that the adoption of the fictitious name of Thomas Nelson & Co., and printing it upon the label in such a manner as to induce the public to believe that the thread is manufactured by them is such a fraud and deception as will not be countenanced by a court of equity protecting the party who contrived it. The answer to this view is—

1st. The use of the name was not with any fraudulent intent, but, as is stated by Mr. Dale, it arose from the fact that his Christian names were Thomas Nelson; and it is quite obvious that it was used for purposes of identification, and with about the same object as if, instead, he had adopted some familiar emblem figure or picture by which the thread might be designated, and become generally known in the market.

2d. The public is not in fact deceived, as it is shown that no such firm exists as Thomas Nelson & Co., who are known to be manufacturers of thread; and the label does not pretend to hold out that any particular manner of manufacturing the thread is followed by which this pretended firm are enabled to furnish a better quality than any one else.

Apart from the use of this fictitious firm name, it is not claimed that the label is false in any other respect; and under the circumstances shown in this case, I think it would be gross injustice to deny the plaintiffs protection in the use of a trademark to which their title has been so clearly established.

Judgment affirmed.