CARLOS D. SIEGERT, ALFREDO C. SIEGERT and LUIS B. C. SIEGERT, Respondents, *v.* CORNELIUS F. ABBOTT, Appellant, Impleaded with CORNELIUS W. ABBOTT.

*Trade mark — necessity of its use by the claimant — when an injunction rests on the theory of false representation — query, as to the use of a word formerly designating a city or country — when equity will interfere.*

The filing in the patent office of a device or name as a trade mark for an article, without afterwards using the emblem or name to designate the article, is not sufficient to establish the right of the persons filing such certificate to such trade mark ; unless the claimant has actually used the mark or device he cannot restrain others from using a similar one.

Query, whether a word which formerly designated a city or country can be used as a trade mark.

A word which truly denotes the nature or the chief ingredient of an article to which it applies may be used by any manufacturer or producer of such article though the word or term has been previously used by others to designate a like article which they produce.

When a trade mark acquired by one person is used, though innocently, by another, the latter becomes liable for the damage caused, and may be restrained from using the device ; but when one seeks to restrain another from using a trade name, or from putting up and selling goods, in any way calculated to induce purchasers to believe that they are buying goods which were manufactured by the complainant, the right of recovery rests upon the theory that a false representation has been made.

Courts of equity should not be swift or vigilant to protect the manufacturer of a compound advertised and sold as a valuable medicine, which is not shown to contain a single medical ingredient, or to possess a single merit claimed for it, as against another manufacturer producing and selling a like compound.

APPEAL by the defendant, Cornelius F. Abbott, from a judgment of the Supreme Court in favor of the plaintiffs, entered, on a decision rendered at the New York Special Term, in the office of the clerk of the city and county of New York on the 16th day of December, 1890, as modified by an order made at the New York Special Term, and entered in said clerk's office on the 31st day of December, 1891.

The court found that in the year 1824, Dr. Johannes G. B. Siegert, then a resident of the city of Angostura, Venezuela, South America, prepared a cordial or liquor, and about 1830 he engaged at that city in the business of manufacturing and selling the preparation as an

article of commerce. The evidence shows that from 1830 to 1864 he continued the manufacture and sale of the article as sole proprietor, and that from the year 1864 to 1870, when he died, he was engaged in partnership with his son, Carlos D. Siegert, in the manufacture and sale of the article. After the death of Dr. Siegert, his sons, the present plaintiffs, under the firm name of "Dr. J. G. B. Siegert & Hijos," continued the manufacture and sale of the same article.

In 1846 the name of the city of Angostura was changed by statute to Cuidad Bolivar, since which time the city has been known by the last-mentioned name. This article was manufactured at the city of Angostura or Cuidad Bolivar until 1876, when the Siegerts ceased to manufacture it at that place, and began to manufacture it at Port of Spain, in the island of Trinidad, where it has ever since been manufactured by them. This article has been put up and sold in bottles of two sizes, quarts and pints, on which were pasted printed wrappers or labels. Prior to 1875 the heading of their label was : " Aromatic Bitters, prepared by Dr. Siegert, at Angostura (now Cuidad Bolivar)."

From 1875 to 1884 the label was in the following form : " Aromatic Bitters, or Angostura Bitters, prepared by Dr. Siegert, at Angostura (now Port of Spain, Trinidad)."

In 1881 the plaintiffs filed a bill in equity in the State of Maryland to restrain C. W. Abbott & Co. from using their trade mark or trade name. They were defeated in this action upon the ground that their label was false in not disclosing the fact that Dr. Siegert was dead and that the article was no longer manufactured at Angostura. (61 Md. 286.) After the entry of this judgment the Siegerts changed the title of their label, and adopted the label now in use which is given below.

From 1872 to 1875 the firm of G. H. Maynard & Co. manufactured at Baltimore, Md., an article which they sold in the market under the name of " Angostura Aromatic Bitters." Cornelius F. Abbott was a member of this firm.

In 1876 C. W. Abbott & Co. succeeded to the business of G. H. Maynard & Co., and have continued the manufacture and sale at Baltimore of a preparation designated as " Angostura Aromatic Bitters."

*John Brooks Leavitt*, for the appellant.

*Frederick R. Coudert*, for the respondents.

FOLLETT, J.:

To constitute a valid trade mark the designation or term applied to the article must be one which the claimant has the exclusive right to use. (*Canal Co.* v. *Clark*, 13 Wall. 311.) It is apparent on principle, and it is well settled by authority, that no one can acquire the exclusive right to use a geographical name or a term which denotes the nature of the article to which it is applied. (*Caswell* v. *Davis*, 58 N. Y. 223; *Keasbey* v. *Brooklyn Chemical Works*, 50 N. Y. St. Repr. 483; S. C., 21 N. Y. Supp. 696.) The court found that the name " Angostura Bitters " was given by the Siegerts to their mixture because it was manufactured at the city of Angostura. It appears from the plaintiffs' evidence that the word " Angostura " did not appear on their labels as descriptive of the article until 1875, three years after G. H. Maynard & Co., the defendants' predecessors, began to use the term " Angostura Aromatic Bitters " to designate an article made and sold by them. The plaintiffs' agent in this country, who verified the complaint, was sworn on the trial and testified that since 1878 the bitters made by the Siegerts have been advertised and sold all over the world under the name of " Angostura Bitters." There is some slight evidence, mostly hearsay in its character, that prior to 1875 Siegert's bitters were sometimes known as " Angostura Bitters." This evidence was given by one Wuppermann, who was but fifty-one years of age at the time of the trial, and left Angostura when twelve years of age, and by Paez, who thinks he first saw the article in 1843. The Siegert memorial tablet, which the plaintiffs put in evidence, states that " in 1824 Dr. Siegert prepared the bitters for his own use, and in 1830 a shipment was sent to Trinidad and to England, but that in 1853 their sale did not exceed twenty dozen bottles per annum." But there is no evidence that the Siegerts applied that name to their compound when put up for sale prior to 1875. It was shown that December 12, 1871, the Siegerts filed in the patent office a so-called trade mark, by which they designated their compound 'as " Siegert's Angostura Bitters," but there is no evidence that this term was ever applied to the article as sold on the market. The filing in the patent office of

a device or name as the trade mark for an article, without afterwards using the emblem or name to denote the article sold, is not sufficient to establish the right of the persons filing such a certificate to such trade mark, and unless the claimant has actually used the mark or device he cannot restrain others from using a similar name.

Subsequent to 1875 their bitters, when placed on the market, were labeled : " Angostura Bitters, prepared by Dr. Siegert, at Angostura (now Cuidad Bolivar). "

Though in 1846 Angostura ceased to be the legal name of the city, it has been since so called, and is carried in geographical gazetteers, encyclopædias and on maps by its former name. (Black's Atlas, Johnson's Atlas, Lippincott's Gaz., Globe Gaz.)

Whether a word which formerly designated a city or country can be used as a trade mark need not now be decided, for the reason that the evidence in this case shows that the defendants, and not the plaintiffs, first used the word " Angostura " to designate an article sold on the markets. Besides, one of the defendants testified, and in this he was not contradicted, that " Angostura bark is the largest ingredient in it (defendants' mixture), and it is from that which it takes its name."

The other defendant, when speaking of the receipt from which their article was compounded, testified : " I remember that Angostura bark was one of the articles mentioned in the receipt ; don't recollect what part of the receipt it appeared in ; I know it is probably the biggest thing there."

The word " Angostura " has long been used in medical and scientific works to designate the bark of a South American tree, having well-known medical properties. The following definition of this word is given in " Murray's New English Dictionary " :

" Angustura, or Angostura, a town on the Orinoco, now called Ciudad Bolivar. It gives its name to a bark, valuable as a febrifuge and tonic, the produce of Galipea or Cusparia febrifuga."

" 1791. A. Brande (title) Experiments and Observations on the Angustura Bark. 1840. Pereria Mat. Med. 1204. Angostura Bark was first publicly noticed in the London Medical Journal for 1789. 1866. Masters in Treas. Bot. 517. The means, chemical and otherwise, of distinguishing the true from the false Angostura barks. 1879. Miss Braddon, Vixen, III, 191. Propped up with sherry and

Angostura bitters. 1879. Watts' Dict. Chem., 3d Suppl. 87. Sections of true Angostura bark. 1881. Syd. Sec. Lex. Angustura."

The word is defined in the Century Dictionary as follows: " Angostura or cusparia bark, the product of a rutaceous shrub, *Galipea Cusparia*, of the mountains of Venezuela, a valuable tonic in dyspepsia, dysentery and chronic diarrhœa.. It was formerly prized as febrifuge, and is now much used in making a kind of bitters. Its use in medicine was discontinued for a time because of the introduction into the markets of a false Angostura bark, obtained from the nux vomica tree, which produced fatal effects."

A word or term which truly denotes the nature or the chief ingredient of an article to which it is applied may be used by any manufacturer or producer of such article, though the word or term has been previously used by others to designate a like article which they produced. (*Caswell* v. *Davis*, 58 N. Y. 223; *Keasbey* v. *The Brooklyn Chemical Works*, 50 N. Y. St. Repr. 483; S. C., 21 N. Y. Supp. 696.)

We think the evidence in the record and the authorities make it plain that the plaintiffs have failed to establish that they have acquired a valid trade mark by the use which they have made of the word " Angostura " standing alone or as combined by them with other words.

Have the defendants, by the mode in which they have put up and described their fluid, deceitfully induced purchasers to believe that they were buying the article manufactured by the plaintiffs instead of the one manufactured by the defendants, or is the defendants' method of bottling, labeling and describing their article likely, in the future, to induce purchasers, exercising reasonable prudence, to purchase and use the defendants' mixture upon the belief that it is the plaintiffs' and so injure the plaintiffs' business?

When a trade mark acquired by one person is used, though innocently, by another, the latter becomes liable for the damages caused, and may be restrained from using the device. But when one seeks to restrain another from using a trade name, or from putting up and selling goods in any way calculated to induce purchasers to believe that they are buying goods which were manufactured by the complainant, the right of recovery rests upon the theory that a false representation has been made. The rule is well stated in *Singer Manufacturing Co.* v. *Wilson* (2 Ch. Div. 434).

FIRST DEPARTMENT, OCTOBER TERM, 1893.          [Vol. 72.

When this action was begun the litigants were selling their compounds in quart and pint bottles made of glass of much the same shape, though there is a perceptible difference between them. The bottles used by the plaintiffs have the name "Dr. J. G. B. Siegert & Hijos" blown in their shoulders and bottoms. The bottles used by the defendants have the name "C. W. Abbott & Co., Baltimore, Md." blown in their shoulders and bottoms. On the bottles used by the plaintiffs there is a label printed in English, French, German and Spanish on which two medallions are represented. The bottles used by the defendants are wrapped in a label printed in English, French and German, but no medallions are represented. The following are copies of the description in English printed upon the bottles used by the litigants:

AROMATIC BITTERS or ANGOSTURA BITTERS

formerly prepared at Angostura, by DOCTOR SIEGERT, and now in Port of Spain, Trinidad, by his sons and successors under the old firm or name of

Dr. J. G. B. SIEGERT & HIJOS.

"These bitters do not only distinguish themselves by their flavour and aromatic odour above all others generally used, but are at the same time an excellent tonic and an efficacious stimulant to incite the appetite. They are principally used thus: Pour half a tablespoonfull in a wineglass, mix it with rum, wine or other licor,* and take it before breakfast or dinner or at any other hour of the day if you should feel inclined; they can likewise be used in sugar and water or syrup and thus composed they have an agreeable taste and are more suitable for ladies and children. They are moreover an excellent remedy for removing indigestion, flatulency, hysterical and hypochondriac attacks, colics, colds, pains of the stomach and diarrhœa which originate from weakness and relaxation of the digestive organs. In such cases the dose is from half to a tablespoonfull, according to the violence of the attack, and may be taken, mixed as above mentioned or pure, once or several times per hour or in the course of the day until the disease disappears. Besides their extreme usefulness in the cure of fever and ague, they are also an excellent preservative against the aforesaid maladies; in the

---

* Sic.

former case the dose is from half to one tablespoonfull, either mixed as above, and to be taken two, three, four or more times during the day while the patient is free from fever; in the latter case adapt their principal applications according to the general use of bitters. When administered to children above two years old, the dose should be from 20 to 60 drops in proportion to the age. In fine, they can be applied with success for the improvement of new rum, by using two tablespoonfull of Bitters to each gallon of rum, and thus they remove its bad smell and acrid taste, giving it immediately an agreeable flavour similar to old rum.

" Besides the above mentioned advantageous qualities of these Bitters, they are of a most important service as a remedy against the Asiatic Cholera and Cholerin, in every instance where they have been employed with a splendid success. In such cases the dose is of one or two tablespoonfulls, repeating the same every day three or four times, until a favorable result is obtained, which is very often experienced. For women and children, the doses are to be smaller in proportion to their age and constitution, and to be taken mixed with good wine, brandy, or pure. Their ordinary daily use as Bitters, is generally found to be a preservative against the aforesaid Cholera and Cholerin."

" ANGOSTURA AROMATIC BITTERS,

" Prepared by C. W. Abbott & Co., 18 Camden Street, Baltimore, Md.

" The utmost care is used in compounding these bitters, both in selecting the materials and in extracting and compounding their medicinal and valuable properties. Certain barks and roots long known and highly prized in the materia medica have been made to yield their most valuable properties, and these have been so combined by the art of the apothecary of ancient times as to produce the best tonic and appetizer known.

" These bitters have been used for many years throughout this country and elsewhere, both as a medicine and for cocktails and flavouring wines and liquors. For these purposes they stand preeminent, imparting a fine aromatic flavor and removing the unpleasant odor usually found in new liquors; when used to impart flavor and color use 6 to 8 drops to a wineglass.

" This wonderful Tonic is unequalled as a cure for Liver Complaint, Dyspepsia, Fever and Ague, Bilious, Intermittent and Remittent Fevers.

" It is also invaluable in Nervous Weakness of all kinds, and will restore the wasted strength with wonderful permanence.

" It will be found totally different from any other Bitters, and is so pronounced by the best physicians in this country. It contains no mineral or poisonous qualities, but is composed entirely of vegetable matter. Dose for the above, one part Bitters and two parts water. If taken pure, one-third wineglass, three times daily; besides being a preventive of the above-named diseases, it is a sure remedy for Asiatic Cholera and Yellow Fever, which have of late years visited some of our southern cities. In every instance they have been employed with success.

" Dose — ⅓ wineglass, four or five times per day until the danger is past. Graduate dose according to age. For adults a half wineglass full will obviate the effects of Debility and restore the functions in cases of Diarrhœa, Nausea and Seasickness. We have the amplest and most gratifying testimonials to their efficacy and value from the best medical authority in this country and from the proprietors of the first houses throughout the United States where-it has been long and favorably known."

It will be observed that in the title of the label used by the defendants are the words: "Angostura Aromatic Bitters, prepared by C. W. Abbott & Co., 18 Camden Street, Baltimore, Md."

These words are printed from clear type of good size. The title of the plaintiffs' label contains the following words : "Aromatic Bitters or Angostura Bitters, formerly prepared at Angostura by Doctor Siegert, and now in Port of Spain, Trinidad, by his sons and successors under the old firm or name of Dr. J. G. B. Siegert & Hijos."

These words are also clearly printed from type of good size. It is difficult to see how a purchaser, exercising reasonable prudence, could be led to believe that he was purchasing the article manufactured by the plaintiffs instead of the article manufactured by the defendants. It will be observed that the merits and uses of these mixtures are differently described in the labels. In the defendants' description it is said : " These bitters have been used for many years

throughout this country and elsewhere both as a medicine and for cocktails and flavoring wines and liquors. For these purposes they stand pre-eminent, imparting a fine aromatic flavor and removing the unpleasant odor usually found in new liquors."

The plaintiffs in their description do not recommend the articles as specially useful in the manufacture of *cocktails*, but assert that the article " can be applied with success for the improvement of new rum *  *  *  and thus they remove its bad smell and acrid taste, giving it immediately an agreeable flavoring similar to old rum."

The plaintiffs also assert that their bitters are " an excellent remedy for removing indigestion, flatulency, hysterical and hypochondriac attacks, colics, colds, pains of the stomach and diarrhœa, which originate from weakness and relaxation of the digestive organs," while the defendants say that " this (their) wonderful tonic is unequalled as a cure for liver complaint, dyspepsia, fever and ague, bilious, intermittent and remittent fevers. It is invaluable in nervous weaknesses of all kinds and will restore the wasted strength with wonderful permanence." The plaintiffs assert that their bitters " are of a most important service as a remedy against Asiatic cholera and cholerin. In every instance where they have been employed with a splendid success." The defendants state that their article " is a sure remedy for Asiatic Cholera and Yellow Fever. *  *  *  In every instance they have been employed with success."

Here we find another marked difference in the descriptions of the merits of the two articles, the defendants' mixture being a cure for yellow fever and the plaintiffs' not. A person apprehending or suffering from an attack of Asiatic cholera might purchase and use either or both kinds of bitters and probably with the same result, while one having or apprehending yellow fever, would, we assume, surely buy and use defendants' mixture.

The diseases which these two kinds of wonderful bitters prevent and cure are not identical, as will be observed by any reader of ordinary intelligence, and we must presume that they are purchased for the uses for which they are so highly recommended by their manufacturers. The plaintiffs, in describing how their articles should be used, say : " They are principally used thus : Pour half a tablespoonful in a wine glass, mix it with rum, wine or other liquor, and take it before breakfast or dinner, or at *any other hour of the*

*day if you should feel inclined.*" It is also asserted that when used with sugar, water or syrup, their bitters " are more suitable for ladies and children." The defendants do not state that their article is suitable for the use of women and children. The defendants also state that " certain barks and roots, long known and highly prized in the Materia Medica have been made to yield their most valuable properties, and these have been so combined by the art of the *apothecary of ancient times as* to produce the best tonic and appetizer known." No such claim is put forth in behalf of the plaintiffs' mixture. We think it is apparent that a cursory examination of the bottles and of the claims of the merits of their contents set forth by the litigants on their wrappers shows that the bitters are made by different firms, at places widely separated, and that the evidence is insufficient to sustain a finding that the defendants have simulated the plaintiffs' goods with the intent to deceive intending purchasers, and that there is no such probability of such purchasers being deceived by the way in which the defendants have prepared and placed their article on the market as to require the intervention of this court in behalf of the plaintiffs. Neither of the litigants gave any evidence tending to show that the bitters prepared by them respectively possessed any medicinal qualities, or had served any useful purpose except as an article for sale. The plaintiffs did not show that Angostura bark or any extract of it entered into the composition of their bitters, nor did they specify a single ingredient used in their manufacture.

The rights of these plaintiffs were considered in *Siegert* v. *Findlater* (7 Ch. Div. 801). It is there held that Siegerts' mixture was first introduced in England in 1863, since which their popular name has been " Angostura Bitters." But that the Siegerts did not adopt and apply that name to their mixture until after that name had been used by Meinhard in 1874, as descriptive of a kind of bitters made by him. It was held that the Siegerts failed to establish a valid trade mark, but it was also held that the mode in which the defendant put up and described his mixture was calculated to and was intended by the defendant as a deception. In that case the defendant was restrained " from using the words ' Angostura Bitters' or the word ' Angostura,' on any bitters or other fluids contained in bottles, not made by the plaintiffs, so as to induce the belief that such bitters or fluids are made by the plaintiffs, and further from selling or offering

for sale any bitters or other fluids in the bottles, in the wrappers,. and in the general form in which the defendants were selling the: bitters called by them ' Angostura Bitters' at the commencement of this action, or in any other wrappers or form contrived or designed. to represent and induce the belief that the bitters or fluids sold by the defendants, and not made by the plaintiffs, are the goods of the: plaintiffs."

In the case at bar the judgment goes much further and restrains. the defendants from using the words " Angostura Bitters " or the word " Angostura," or any imitation of such word, on any bitters or cordials made by or for the defendants. It is clearly shown, we think, that the plaintiffs have no trade mark in these words nor any right to their exclusive use, and the only possible relief that the plaintiffs could be entitled to under the most favorable view of their own evidence would be a judgment restraining the defendants from using those words in such a way as to lead purchasers to believe that. they were buying the plaintiffs' bitters when, in fact, they were buying the defendants'.

If these bitters have no medicinal properties, and are only useful for flavoring wines and liquors, they should be so advertised and sold,. and not advertised and sold as having medicinal merits unless they possess such merits, otherwise courts of equity will not look with. favor on the application of the manufacturers for protection against rivals engaged in the same pursuit.

In *Fowle* v. *Spear* (7 Penn. L. J. 176 ; Cox T. M. Cases [2d ed.],. 90), an injunction to restrain the use of labels and bottles similar to. those used by the plaintiff was refused on the ground that the plaintiff had misrepresented, by his labels, the qualities and properties of his medicine. (Browne Tr. M. § 351. See, also, *Leather Co.* v.. *American Leather Cloth Co.,* 4 De G., J. & S. 137 ; S. C. affd., 11 H. L. Cas. 522 ; *Connell* v. *Reed,* 128 Mass. 477 ; *Munhattan Medicine Co.* v. *Wood,* 108 U. S. 218 ; *Fetridge* v. *Wells,* 4 Abb. Pr.. 144 ; *Dale* v. *Smithson,* 12 id. 237 ; Big. Law of Fraud, 560.)

We do not think courts of equity should be swift or vigilant to: protect the manufacturer of a compound advertised and sold as a valuable medicine, which is not shown to contain a single medical ingredient, or to possess a single merit claimed for it as against another manufacturer producing and selling a like compound.

The judgment should be reversed and a new trial granted, with costs to the appellant to abide the event.

O'BRIEN and PARKER, JJ., concurred.

Judgment reversed and new trial granted, with costs to the appellant to abide event.